# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 572 | **DATE** | 6/15/2004 |
| **CASE TITLE** | | Michael E. Davis vs. Charles Novy and Luis Escobar | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. The Court grants the Defendants' motion for judgment as a matter of law [#75]. The Clerk is directed to enter judgment in favor of the Defendants. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUN 1 6 2004 | 79 |
| | Docketing to mail notices. | | date docketed | |
| ✓ | Mail AO 450 form. | | GWA | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| | | | 6/15/2004 | |
| FT/ | courtroom deputy's initials | | date mailed notice | |
| | | | FT | |
| | | | mailing deputy initials | |

CLERK, U.S. DISTRICT COURT

2004 JUN 15 AM 5:05

Date/time received in central Clerk's Office

FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
JUN 1 6 2004

| | | |
|---|---|---|
| MICHAEL E. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 03 C 572 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge |
| CHARLES NOVY and LUIS ESCOBAR, | ) | Arlander Keys |
| individually and in their capacity | ) | |
| as Bolingbrook police officers, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Michael Davis sued Charles Novy and Luis Escobar, both
police officers with the Village of Bolingbrook, alleging that
they violated his Fourth Amendment rights during the course of a
traffic stop and the subsequent search of his truck and his home.
The case went to trial on May 17, 2004, and, at the close of the
plaintiff's case, the officers moved for judgment as a matter of
law. For the reasons explained in this Memorandum Opinion and
Order, the Court grants the officers' motion.

A.    Factual Background

On February 9, 2002, Michael Davis was driving around his
Bolingbrook neighborhood taking pictures of snow mounds. Mr.
Davis, who uses a wheelchair to get around, was attempting to

79

document a problem with the way the village plowed snow;
according to Mr. Davis, the plows piled the snow in a way that
blocked his access to streets and sidewalks and prevented him
from taking his dogs out for exercise.  Mr. Davis left his house
at about 11:30 a.m., driving around the neighborhood in his 1995
dark green Ford F150 pickup truck with a black camper shell on
the back of it.

At about noon that same day, the Bolingbrook police
department received a call through its 9-1-1 dispatcher,
complaining that a white male was driving around the area of
Commonwealth and Brighton in Bolingbrook, taking pictures of a
young girl.  The caller reported that the man was wearing a hat
and driving a black Ford pickup truck with a cab on the back.
The dispatcher assigned two officers to respond to the call,
Officer Charles Novy and Officer Luis Escobar.

Upon arriving at the general area reported in the call,
Officer Novy saw Mr. Davis, a white male, and his dark green Ford
pickup truck with a cab on the back of it.  Officer Novy followed
Mr. Davis for a bit, and then pulled him over.  Upon doing so,
Officer Novy noticed a hat and a camera bag on the seat next to
Mr. Davis; he also saw towels, duct tape and rope in the cab.
When Mr. Davis could not provide a valid Illinois driver's
license or proof of insurance, Officer Novy arrested him, placing
him in the backseat of his squad car.

Officer Escobar joined the two at some point during this initial encounter. The officers searched Mr. Davis' truck, after obtaining Mr. Davis' permission to do so, and found a pair of women's thong underpants and a stub from the Brookfield Children's Zoo. They then asked him to sign a card stating: "I give the Bolingbrook police department permission to search the following: [here, Officer Escobar had filled in "residence"] located at the following: [here, Officer Escobar had filled in 1095 Bothwell," Mr. Davis' address]. I give this permission voluntarily & without threats or promises of any kind." *See* Plaintiff's Exhibit 8. Mr. Davis signed the card, and the officers searched his home. That search turned up nothing to suggest that Mr. Davis was involved in any way with child pornography or other child exploitation.

After the search, the officers and Mr. Davis went back outside, where Officer Novy issued citations to Mr. Davis for driving without a valid Illinois' driver's license, for driving an uninsured vehicle, and for having an obstructed registration sticker on his rear license plate - all violations of the Illinois vehicle code. Officer Novy allowed Mr. Davis to give a signature in lieu of posting a bond, and then he left; Officer Escobar left while Novy was writing up the citations.

Almost a year later, on January 24, 2003, Mr. Davis sued Officer Novy and Officer Escobar, alleging that they violated his

constitutional rights in the course of the initial stop, and in the subsequent searches of his person, his truck and his home.

B.    The Trial

The case was tried before a jury on May 17, 18 and 19, 2004. At trial, Mr. Davis testified first. He explained that, on February 9, 2002, he decided to drive through the neighborhood to take pictures of snow mounds so that he could show the Village how the snow impeded his access to the streets and sidewalks, and to try to find a way to solve the problem. Tr. at 106. He described the route he drove, which, according to the map shown to the jury, put him in or near the area reported in the 9-1-1 call. Tr. at 111-12.

Mr. Davis testified that, at some point while he was out on his picture-taking expedition, he noticed a police car following him, and he was eventually pulled over. Tr. at 110, 112-13. He testified that, when Officer Novy approached the truck, he asked the officer whether he had done anything wrong, and Officer Novy had responded "no." Tr. at 113. According to Mr. Davis, Officer Novy said he stopped him because the police department had "received an anonymous 911 phone call from some woman stating that I had been taking pictures of children." Tr. at 114. Mr. Davis testified that Officer Novy then asked him for his driver's license and insurance card; he produced his Indiana driver's license, which he learned was no longer valid, but he was unable

4

to provide an insurance card.  Tr. at 115, 117.

Mr. Davis testified that Officer Escobar arrived on the scene about this time, and, after the two officers conferred briefly, Officer Novy asked Mr. Davis if he could search his truck.  Tr. at 117-18.  Mr. Davis testified that he asked what would happen if he refused, and Officer Novy told him that they would have to impound his truck and take him to jail.  Tr. at 118.  Mr. Davis testified that he then agreed to the search; Officer Novy searched his truck for about 30 to 45 minutes, while Mr. Davis sat on the tailgate of his truck, with Officer Escobar standing in front of him in a defensive posture.  Tr. at 119-20, 122.

Mr. Davis testified that, after Officer Novy searched the truck, he told Mr. Davis he was under arrest; Officer Novy patted him down and asked him to empty his pockets, which he did.  Tr. at 123.  Mr. Davis testified that Officer Novy then placed him in the backseat of the squad car and told him that he wanted to search his house, which was just a few blocks away.  Tr. at 13-24.  Mr. Davis testified that he again asked what would happen if he refused, and Officer Novy again told him that he would impound his truck and take him to jail.  Tr. at 124.  Mr. Davis testified that the officers presented him with a consent card, and he signed it.  Tr. at 124, 127.  The three then proceeded to his house, where Officer Novy searched through his bedroom (in the

closets, dresser drawers, and boxes) and took a cursory look through his garage, then they went back outside. Tr. at 131-33. Mr. Davis testified that Officer Novy then wrote out the tickets and filled out some other paperwork, gave copies to him, and then left. Tr. at 133-34.

Mr. Davis conceded that he had committed the violations for which he ultimately received citations: he testified that he had moved to Illinois in August of 2001, and that he had never obtained an Illinois driver's license; he admitted that, on the morning of February 9, 2002, the registration sticker on the rear license plate of his truck was partially obscured by the bracket around the plate; and he admitted that, as of that date, he had no insurance for his truck. Tr. at 103, 146-48, 150-51. Mr. Davis testified that, when Office Novy approached his truck, there was, in fact, a hat, a camera, a camera bag, towels, duct tape and rope in the cab of his truck, all either on the seat next to him or on the floor of the cab. Tr. at 153-54.

With respect to the officers' demeanor, Mr. Davis testified that, during the initial traffic stop, Office Novy was polite to him; he was neither rude nor abrasive, threatening nor offensive. Tr. at 152. So too during the course of the search of his truck. Tr. at 161. He testified that the officers did not touch him or handcuff him; they did not display their weapons. Tr. at 156-57, 162. Mr. Davis testified that he had agreed to the searches of

his truck and home, but that he did so because he felt coerced by Officer Novy's initial comment to him that the police had received a call about someone taking pictures of children. Tr. at 178-80. He later testified that he also felt coerced because of Officer Novy's statement that, if Mr. Davis did not allow the officers to search his truck and his home, they would arrest him, take him to jail, and impound his truck. Tr. at 181. Mr. Davis testified that he also felt coerced when Officer Novy put him in the backseat of his police car and closed the door. *Id.* at 182.

Next, the plaintiff called Officer Novy to the stand. He testified that he was on duty at around noon on February 9, 2002 when he received a call on his MDT in his squad car indicating that the department had received a complaint, via cell phone, about a man in a truck taking pictures of kids. Tr. at 185. According to the report, the suspect was a white male wearing a hat and driving a black Ford pickup with a cab on the back; he was reportedly driving near the intersection of Commonwealth and Brighton in Bolingbrook. Tr. at 185, 188. Officer Novy testified that he responded to that general area, where he saw Mr. Davis' truck, which, in his view, closely matched the truck described in the report. *Id.* at 188-89.

Officer Novy testified that he pulled in behind Mr. Davis and followed him for a time. Tr. at 245-46. He further testified that he then noticed that the registration sticker on

the rear license plate of Mr. Davis' truck was obstructed or covered such that the month of expiration was unreadable, and that he knew that was a violation of the Illinois vehicle code. *Id.* at 246. Officer Novy testified that, after following Mr. Davis for a while, and after learning from Officer Escobar that he had no additional information on the report, Officer Novy radioed in a traffic stop, engaged his emergency lights and pulled Mr. Davis over. Tr. at 190-95, 247. Officer Novy testified that, when he made the decision to stop Mr. Davis, he had two things in his mind: first, he was thinking that this vehicle matched the description of the vehicle reported over the MDT, and, second, he was thinking that the same vehicle was showing a clear violation of the Illinois vehicle code. Tr. at 246-47.

Officer Novy testified that, after Mr. Davis pulled over, he walked up to the truck and asked Mr. Davis for his driver's license; as he did so, he looked into the cab and saw a camera bag and black hat on the seat next to Mr. Davis, rope and duct tape on the floor of the cab, and towels covering the seat, the floor and the dashboard of the truck. Tr. at 247-48. He testified that those things, even if seemingly innocuous on their own, together raised some red flags in his mind, given his experience and training. Tr. at 247-50. Additionally, when Officer Novy asked Mr. Davis for his driver's license, Mr. Davis

produced an Indiana license; and when Officer Novy asked Mr. Davis for proof of insurance, he was unable to provide it; those things were significant to Officer Novy because they both amount to violations of the Illinois vehicle code. Tr. at 251-53.

Officer Novy testified that, after the conversations about Mr. Davis' driver's license and inability to provide an insurance card, he told Mr. Davis that he pulled him over because the frame on his rear license plate covered the sticker, which is a violation of the Illinois vehicle code. Tr. at 253. Officer Novy testified that he then asked Mr. Davis if he had been taking pictures, and explained that the police department had received a call about someone taking pictures of children. Tr. at 253-54. According to Officer Novy, Mr. Davis explained that he had been taking pictures of snow mounds and why; he also offered to turn over a roll of film to corroborate his story. Tr. at 254. Officer Novy testified that he was polite at all times to Mr. Davis, and that Mr. Davis was cooperative at all times with the officers. Tr. at 256-57, 259-60, 267.

Officer Novy testified that he asked Mr. Davis for permission to search the cab of his truck, Mr. Davis agreed to the request, and walked to the tailgate of his truck, where he waited with Officer Escobar while Officer Novy searched the truck. Tr. at 259-61. Officer Novy testified that, in the course of that search, which took about twenty minutes, he found

a pair of black thong underwear and a ticket stub to the Brookfield Children's Zoo. Tr. at 262-63. Officer Novy testified that, after discussing the situation with Officer Escobar, he advised Mr. Davis that he was under arrest for not having a valid Illinois driver's license, for having no insurance and for having an improper display of his registration plate. Tr. at 271. Officer Novy testified that he then patted Mr. Davis down, had him empty his pockets, and placed him in the back of his squad car; he did not handcuff Mr. Davis at this time, or ever. Tr. at 272-74.

Officer Novy testified that he and Officer Escobar then decided to ask Mr. Davis for permission to search his home; they had him sign a "voluntary permission to search" card, Tr. at 276-77, and then drove, with Mr. Davis in the backseat, to Mr. Davis' house. Tr. at 280-82. Officer Novy testified that he searched Mr. Davis' house and garage for a total of about twenty-five minutes, and found nothing unusual; they then went outside, Officer Novy issued the three citations to Mr. Davis (one for driving without a valid Illinois driver's license, one for driving an uninsured vehicle, and one for improperly displaying his registration sticker), and completed some additional paperwork, he apologized to Mr. Davis for taking up so much of his time, and then the officers left. Tr. at 290-303. By Officer Novy's estimate, the entire encounter - from the time

Officer Novy pulled Mr. Davis over, to the time he released him from his custody – lasted less than two and a half hours.  Tr. at 319.

With regard to the 9-1-1 call that set in motion the events leading to trial, Officer Novy testified that he had had specialized training in dealing with crimes against children and with pedophiles, and that he was aware of another call that had come in before the call that led to Mr. Davis' arrest; the first call came in roughly eleven days earlier; that call reported a white male taking pictures of a child in the same area as the February 9 call.  Tr. at 241–44.

After Officer Novy, Mr. Davis called his treating psychiatrist, Dr. Gerson Kaplan, to the stand.  Dr. Kaplan testified that he had been treating Mr. Davis since August of 2002, after Mr. Davis was referred to him by a colleague, Dr. Daniel Shapiro.  Tr. at 332.  Dr. Kaplan testified that Mr. Davis had come to see him because he was upset after the run-in with Officers Novy and Escobar; Dr. Kaplan diagnosed Mr. Davis with post-traumatic stress disorder ("PTSD"), and prescribed antidepressants and various medications to help him sleep.  Tr. at 333–35.  Dr. Kaplan testified that, in his view, Mr. Davis continues to suffer from PTSD as a result of the events of February 9, 2002.  *Id.* at 337–38.  On cross examination, counsel for the defendants raised a number of inconsistencies between

what Mr. Davis had reported to Dr. Kaplan, and what he had reported to the psychiatrists he had seen in the past, and these seemed to surprise Dr. Kaplan. Ultimately, Dr. Kaplan conceded that Mr. Davis' behavior was as consistent with paranoid disorder as it was with PTSD, and that, to the extent Mr. Davis suffered from PTSD, it was not necessarily triggered by the February 9, 2002 encounter with Officers Novy and Escobar; in fact, Dr. Kaplan conceded, Mr. Davis had experienced a number of events before that day that could have been perceived as traumatic and could have triggered the PTSD. Tr. at 351-67.

After Dr. Kaplan, the plaintiff called Pamela Carter, who works in telecommunications with the Bolingbrook police department; Ms. Carter testified about how the calls coming in to the dispatch center are logged and how various codes on the call sheets are interpreted. Tr. at 405-22.

Finally, Mr. Davis called Officer Escobar to the stand. Officer Escobar testified that he received the 9-1-1 call on his MDT and responded to the scene. Officer Escobar testified that he briefly investigated the matter, but he obtained no additional information on the incident, and he reported this fact to Officer Novy, who had also been assigned to the call. Tr. at 436-41. Officer Escobar testified that he then learned that Officer Novy had initiated a traffic stop in connection with the call, and so Officer Escobar began heading in the direction of that stop; when

12

he arrived on the scene, he saw a truck that matched the description given in the 9-1-1 call, and he saw Officer Novy sitting in his squad car right behind the truck. Tr. at 442. At that time, Officer Escobar testified, he walked up to Officer Novy's squad car, and Officer Novy told him that he had stopped Mr. Davis for having an obstructed registration sticker. Tr. at 442-43.

Officer Escobar testified that, Officer Novy told him what he had seen in Mr. Davis' truck and said that he wanted to search the cab; Officer Escobar agreed that, based on what Officer Novy had seen in plain view, a search of the cab was appropriate. Officer Escobar testified that Officer Novy then searched Mr. Davis' truck, while Mr. Davis sat on the tailgate of the truck, and Officer Escobar stood 7 to 10 feet in front of him in an "interview stance" - that is, he stood facing Mr. Davis with his hands out in front of him. Tr. at 443-44. According to Officer Escobar, the search of the truck took about 20 or 30 minutes. Tr. at 444.

Officer Escobar testified that he did not make the decision to arrest Mr. Davis; that decision was made by Officer Novy. Tr. at 448. Escobar further testified that he heard Novy radio to dispatch that he was arresting Mr. Davis for driving without a valid Illinois driver's license. *Id.* Officer Escobar testified that, throughout the encounter, Mr. Davis was very cooperative,

and that he either suggested that the officers search his truck, or Officer Novy asked him if they could search his truck and he said yes. Tr. at 459, 463. In Officer Escobar's view, Officer Novy behaved in a very professional manner in his dealings with Mr. Davis, and Mr. Davis, in turn, was very cooperative with the officers; Officer Novy was never verbally abusive or threatening; he never touched Mr. Davis, never touched his weapon or otherwise gestured in a manner that could be perceived as threatening. Tr. at 464-65.

Officer Escobar testified that, after Officer Novy searched the truck, he told him what he had found, and told him that he wanted to ask Mr. Davis if they could search his house; Officer Escobar agreed that the items in Mr. Davis' truck - the thong and the zoo stub - were cause for concern. Tr. at 466, 468. Officer Escobar testified that he got a consent to search card from his car, filled it out and presented it to Mr. Davis; he testified that he read the card verbatim to Mr. Davis, and that Officer Novy also explained the card, in his own words, to Davis. Tr. at 468-70. Shortly thereafter, Mr. Davis signed the card; according to Officer Escobar, Mr. Davis at no point gave any indication - physical or verbal - that he was unwilling or hesitant to allow the search; on the contrary he remained cooperative throughout. Tr. at 471.

With respect to the search of the house, Officer Escobar

14

testified that he did not really participate, he did not go through boxes or anything like that; instead, his role was to help assure Officer Novy's safety during the search. Tr. at 473-75. Officer Escobar testified that the three went back outside before 2:00 p.m., he helped to start the paperwork and then he left, making a brief stop to report to the supervising sergeant (who was parked just down the street), before heading back to the station. Tr. at 476-77.

C.   The Motion for Judgment as a Matter of Law

At the close of Mr. Davis' case, which, because of the way the witnesses were called and examined, actually include a large part of the officers' case, the defendants moved for judgment as a matter of law. The Court indicated that the motion would be granted, and briefly explained why. The purpose of this Memorandum Opinion and Order is to memorialize, and detail the reasoning behind, the Court's decision on the defendants' motion.

The Federal Rules of Civil Procedure provide that,

> [i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed. R. Civ. P. 50(a). In deciding a motion under Rule 50(a), the Court reviews all of the evidence in the record and draws all

reasonable inferences in favor of the nonmoving party; the Court may not make credibility determinations or weigh the evidence, but gives credence to the evidence favoring the nonmovant, as well as that "evidence supporting the moving party that is uncontradicted and unimpeached . . . ." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000); *Ortloff v. U.S.*, 335 F.3d 652, 660 (7th Cir. 2003)(citing *Payne v. Milwaukee County*, 146 F.3d 430, 432 (7th Cir. 1998)); *Pease v. Production Workers Union of Chicago*, No. 02 C 6756, 2004 WL 526369, at *2 (N.D. Ill. March 15, 2004). "To avoid [an unfavorable ruling under Rule 50(a)], the plaintiff must do more than argue that the jury might have disbelieved all of the defendant's witnesses"; he "must offer substantial affirmative evidence to support [his] argument." *Heft v. Moore*, 351 F.3d 278, 284 (7th Cir. 2003)(citing *Perfetti v. First National Bank*, 950 F.2d 449, 456 (7th Cir. 1991)).

In this case, Officers Novy and Escobar moved for judgment as a matter of law on all of Mr. Davis' claims, arguing, first, that Officer Novy had probable cause to initiate a traffic stop of Mr. Davis' truck, and, second, that the searches of Mr. Davis' person, truck and house were consensual and, therefore, lawful. Officer Escobar also argues that he is entitled to judgment as a matter of law because his role in the events giving rise to any alleged constitutional violation was limited at best. And,

16

finally, the officers argue, even if Mr. Davis' evidence established that constitutional violations had occurred, the officers are nonetheless entitled to judgment as a matter of law because they are shielded from liability for those violations under the doctrine of qualified immunity. The Court agrees on all counts: based upon the evidence presented at trial, even when viewed in the light most favorable to Mr. Davis, a reasonable jury simply could not have found in favor of Mr. Davis with respect to the constitutional violations he alleged. *See Reeves*, 530 U.S. at 135 ("Rule 50 requires a court to render judgment as a matter of law when a party has been fully heard on an issue, and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.").

In his complaint, Mr. Davis claimed that Officers Novy and Escobar, while acting under color of state law, intentionally deprived him of his rights under the Constitution of the United States - namely his right to be free from the unreasonable search and seizure of his person, and the unreasonable search of his vehicle and his home. Specifically, Mr. Davis claimed that the officers violated his constitutional rights when Officer Novy initially pulled him over without reasonable suspicion to believe that he had committed a criminal offense. Mr. Davis further claimed that the officers subsequently violated his rights when they searched his truck and his home; he claimed that, although

he consented to the searches, his consents were invalid because they were the result of coercion and duress. To prevail on his claims at trial, then, he had to produce evidence sufficient to enable a reasonable jury to find that the officers intentionally committed acts that violated his constitutional rights.

To establish a constitutional violation with respect to the initial traffic stop, Mr. Davis had to produce evidence showing that Officer Novy lacked reasonable suspicion to believe that Mr. Davis was, or was about to be, engaged in criminal activity. "Reasonable suspicion" "requires more than a mere 'hunch'"; it is some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Ienco*, 182 F.3d 517, 523, 524 (7th Cir. 1999) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)). On this issue, it is clear that the 9-1-1 call that came from the dispatch center would not have been enough, by itself, to establish reasonable suspicion. *See Florida v. J.L.*, 529 U.S. 266, 270-72 (2000)(an anonymous tip will not give rise to reasonable suspicion unless it is suitably corroborated – both in terms of its tendency to identify a determinate person, and in terms of its assertion of illegality). But it is equally clear that the obstructed registration sticker - which clearly violated Illinois law, *see* 625 ILCS 5/3-413(b)("[r]egistration stickers . . . shall be . . . clearly visible at all times) - would have provided Officer Novy

with reasonable suspicion (and probable cause, for that matter) to stop Mr. Davis. *See Whren v. U.S.*, 517 U.S. 806, 810 (1996)("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred); *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (reasonable suspicion is a less demanding standard than probable cause).

At trial, Mr. Davis admitted that he had committed the violations for which Officer Novy cited him: he testified that he had moved to Illinois in August of 2001, and that he had never obtained an Illinois driver's license; he admitted that, on the morning of February 9, 2002, the registration sticker on the rear license plate of his truck was partially obscured by the bracket around the plate; and he admitted that, as of that date, he had no insurance for his truck. Tr. at 103, 146-48, 150-51. It is true that Officer Novy could not have known, when he made the decision to stop Mr. Davis, that he had no Illinois driver's license and no insurance. Thus the constitutionality of the initial stop depends on whether Officer Novy had noticed that Mr. Davis' registration sticker was obstructed *before* pulling him over. The testimony at trial was uncontroverted that he had.

Officer Novy testified that he responded to the MDT report and immediately noticed Mr. Davis' truck, which matched the description given in the 9-1-1 call; he testified that he pulled

in behind Mr. Davis and followed him for a few minutes, and it was during this time that he noticed that the registration sticker on Mr. Davis' rear license plate was obstructed to the point where it was unreadable, which he knew violated the Illinois vehicle code. Tr. at 245-46. And Officer Escobar testified that Novy told him he had stopped Davis because of the obstructed sticker. Tr. at 461.

Mr. Davis testified that Officer Novy did not mention the obstructed registration sticker right away; in fact, according to Mr. Davis, Officer Novy initially told him that he had done nothing wrong, that he had stopped him because of the 9-1-1 call. Tr. at 113. And Mr. Davis' attorney pointed to this testimony as evidence that Officer Novy actually stopped Mr. Davis because of the call, and not because of any violation of the vehicle code. But Mr. Davis' testimony does not prove that Officer Novy had not yet noticed the sticker when he pulled Mr. Davis over; nor does it contradict Officer Novy's testimony that he saw the obstructed sticker before he decided to stop Mr. Davis. Nothing in the law or the Fourth Amendment would have required Officer Novy to mention at the outset the obstructed sticker.

Officer Novy quite candidly admitted that, when he made the decision to stop Mr. Davis, he had two things in his mind: first, he was thinking that this vehicle matched the description of the vehicle reported over the MDT, and, second, he was thinking that

the same vehicle was showing a clear violation of the Illinois
Vehicle Code. *Id.* at 246-47. Such dual motives are permissible.
Once the vehicle code violation is established, the stop is
constitutional; Officer Novy's mixed motives don't destroy the
constitutionality of that traffic stop. *See Whren*, 517 U.S. at
812-13 (an otherwise valid traffic-violation arrest is not
rendered invalid by the fact that it was "a mere pretext for"
some other type of search; the constitutional reasonableness of
traffic stops does not depend on the actual motivations of the
individual officers involved). The evidence on this point yields
only one possible conclusion: Officer Novy initially stopped Mr.
Davis, at least in part, because of the obstructed registration
sticker. The stop was, therefore, based upon reasonable
suspicion of criminal activity – namely, a violation of the
Illinois vehicle code provision requiring registration stickers
to be clearly visible – and, therefore, satisfies the Fourth
Amendment.

The Court next considers Mr. Davis' claim concerning the
searches of his truck and his home. A search conducted pursuant
to a valid consent is constitutionally permissible. *E.g.,*
*Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United*
*States v. Scheets*, 188 F.3d 829, 839 (7th Cir. 1999). To be
valid, consent must be voluntarily given, however, and
voluntariness is gauged by looking to the totality of all the

surrounding circumstances. *Schneckloth,* 412 U.S. at 226. The testimony at trial shows quite clearly that Mr. Davis voluntarily consented to the searches of both his truck and his home.

Officers Novy and Escobar both testified that Mr. Davis consented to the search of his truck and the search of his home. Both officers testified that Mr. Davis was, at all times, cooperative; he never gave any indication that he objected to the searches. In fact, Mr. Davis admitted that he orally gave the officers permission to search his truck, and he admitted that he signed a consent card for the search of his home; he further admitted that the consent card, on its face, indicated that he was voluntarily agreeing to the search. Mr. Davis also admitted that he did nothing and said nothing to indicate to the officers that he in any way objected to the searches.

At argument on the motion for judgment as a matter of law, Mr. Davis' attorney argued that, although Mr. Davis had outwardly consented to the searches, his consent was not voluntary; rather, it was compelled under the circumstances. But, based on the evidence presented at trial, the circumstances were not so extreme that they could have amounted to coercion or duress. First, the officers testified that their demeanor was, at all times, polite and professional, and Mr. Davis agreed that this was the case; he testified that the officers were never threatening or offensive, they never touched him, never displayed

their weapons. The officers did nothing to coerce, harass, intimidate or threaten Mr. Davis; nor is there any evidence to suggest that they otherwise improperly induced Mr. Davis' consent. In fact, as the Court understands counsel's argument, Mr. Davis concedes that the alleged coercion stemmed, not from anything the officers said or did, but from the fact that Mr. Davis was disabled, that he was worried about what would happen to his dogs if he went to jail, that he was worried about how he could get to work if his truck was impounded, and that he was worried that his neighbors would walk by, see what was going on, and think he was a pervert or pedophile.

As an initial matter, the fact that the officers explained to Mr. Davis what would happen if he refused to consent to the searches, i.e. that his truck would be impounded and he would go to jail, does not render the consents involuntary. *See Scheets*, 188 F.3d at 840 (an agent's explanation of what would transpire does not render a consent involuntary). Officer Novy truthfully reported what the law required him to do, and there is no evidence to suggest that he explained the situation in a way calculated to induce Mr. Davis' consent. Moreover, the Court recognizes that, if these things had come to pass, Mr. Davis would have been terribly inconvenienced – if he had been taken to jail, he would have had to make arrangements for the care of his dogs, and if he had lost his truck, he would have had to make

other arrangements for getting around. But the potential for inconvenience does not rise to the level of duress or coercion required to vitiate an otherwise voluntary consent.

Nor would the potential for embarrassment be enough to vitiate the consent. It is true that the stop took place on a sunny Saturday afternoon, within a few blocks of Mr. Davis' home, and that, during the stop, the lights were flashing on at least one of the squad cars. But, as plaintiff's counsel admitted at oral argument on the motion, any traffic stop involves some level of embarrassment, as others pass by staring, wondering what the subject of the stop might have done wrong. Mr. Davis' arguments to the contrary notwithstanding, the officers did and said nothing that would have given any potential passerby any idea that Mr. Davis had been stopped in connection with a call about a potential pedophile. The officers did nothing that would have indicated to a passerby that Mr. Davis was being detained for anything other than a run-of-the-mill traffic violation; there is nothing to suggest that they were, for example, making a show of the thong they found, or speaking loudly about the 9-1-1 call, or the fact that the items in Mr. Davis' truck suggested that he might have been the one taking pictures of kids. Officer Novy's search of the truck was limited in scope and duration, tailored to achieve the officer's reasonable objectives.

Further tipping the scales against Mr. Davis' coercion

argument is the fact that he is highly educated – by his own admission, he has two master's degrees and an uncompleted doctorate degree; he is also older than both of the officers. To the extent he was vulnerable because of his inability to walk great distances, his education, work experience, and age would seem to have balanced that out. *See, e.g., Schneckloth*, 412 U.S. at 226 (in determining whether a person's will was overborne, the Court considers, among other things, the person's age and lack of education, level of intelligence).

In view of all of the surrounding circumstances, including most notably the officers' demeanor, Mr. Davis' physical and mental capabilities, and the duration and scope of the intrusions, Mr. Davis consented to the searches of his truck and his home, and those consents were voluntary. No reasonable jury could have found otherwise.

D.    <u>Qualified Immunity</u>

Finally, even if the consents were invalid, and even if the initial stop or subsequent searches fell short of satisfying Fourth Amendment standards, the Court finds that the officers would have been shielded from any liability under the doctrine of qualified immunity.

"[G]overnment officials performing discretionary functions" are shielded from liability "as long as their actions could reasonably have been thought consistent with the rights they are

alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citations omitted). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken . . . ." *Id.* at 639. The doctrine of qualified immunity allows for the realization that "[i]t is sometimes difficult for an officer to determine how [a particular] legal doctrine . . . will apply to the factual situation the officer confronts." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). "If the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." *Id.* Thus, "[o]fficers under this standard may be protected from liability for objectively reasonable decisions, even if wrong"; "qualified immunity is not forfeited unless 'no reasonable officer could have mistakenly believed' that the conduct was unlawful." *Saffell v. Crews*, 183 F.3d 655, 658 (7th Cir. 1999) (citing *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)).

The Court first considers whether Officer Novy is entitled to qualified immunity. With respect to the initial decision to stop Mr. Davis, if, as the evidence shows, Officer Novy stopped Mr. Davis, even in part, because of the obstructed registration

26

sticker, the stop was constitutional and Officer Novy could not be held liable for any harm Mr. Davis suffered. But even if the Court assumes, as Mr. Davis argued, that Officer Novy pulled him over solely because of the 9-1-1 call, and that Officer Novy did not notice the sticker until after he stopped Mr. Davis, the Court finds that Officer Novy would still not be liable to Mr. Davis because he would be entitled to qualified immunity.

Although the Court has determined that, under *Florida v. J.L.*, the 9-1-1 call alone could not have provided reasonable suspicion to stop Mr. Davis, the Court nonetheless recognizes that Officer Novy may reasonably have concluded that, under the circumstances, the stop was justified. Officer Novy testified that, with his experience and training, a number of things about Mr. Davis raised red flags from the outset. First, Mr. Davis' truck matched the description of the truck identified in the 9-1-1 call. Second, Officer Novy testified that, in his view, Mr. Davis' behavior was suspicious: when Officer Novy first saw Mr. Davis, he was stopped at the side of the road, and, at least from Officer Novy's perspective, it appeared that Mr. Davis saw the squad car and then began moving. Tr. at 246. Officer Novy also testified that, at the time he responded to the MDT on February 9, 2002, he had information about another call that had come in to the dispatch center eleven days earlier; the call reported a white male taking pictures of a child in the same

area, though the car described in the earlier call was markedly different from the truck described in the second call. As a result of that call, the department had placed that neighborhood on its "frequent patrol" list; officers were paying an exceptionally high degree of attention to that neighborhood, with the express purpose of preventing child exploitation in the area. With his training and experience, Officer Novy could reasonably have believed that these things combined were enough to justify an investigatory stop. Once he made the stop, and once he saw the hat, the camera bag, the duct tape, the rope, and the towels – all in plain view in the cab of Mr. Davis' truck – he reasonably could have believed that further investigation was warranted; indeed, under those circumstances, it is difficult to imagine that any police officer would have behaved differently.

Moreover, based upon Mr. Davis' conduct – which, by Mr. Davis' own admission, indicated a desire to cooperate, and in no way indicated a desire to stop or prevent the searches – Officer Novy could reasonably have believed that Mr. Davis voluntarily consented to the searches of his truck and his home. Based on this evidence, the Court finds that, even if the searches ran afoul of the Fourth Amendment, Officer Novy would not be liable for any resulting damages.

As a practical matter, given the evidence adduced at trial, the Court's qualified immunity analysis with respect to Officer

Novy resolves the question for Officer Escobar as well. The trial testimony establishes that, to the extent Officer Escobar personally did or said anything that might have contributed to the alleged constitutional violations, he was following Officer Novy's lead. Officer Escobar testified that he was not involved in the initial decision to stop Mr. Davis; rather, that was Officer Novy's decision. Officer Escobar also testified that Officer Novy raised the issue of searching, and searched, Mr. Davis' truck and home, whereas Escobar was primarily concerned with ensuring Novy's safety. In other words, Officer Novy was calling the shots, and Officer Escobar was playing a supporting or back-up role. Officer Novy and Mr. Davis testified consistently. Thus, if Officer Novy is shielded from liability, Officer Escobar would similarly be shielded from liability. *See, e.g., United States v. Hensley*, 469 U.S. 221, 232 (1985)(if an officer relies on information or knowledge of another officer, he is entitled to qualified immunity, as long as his reliance was objectively reasonable). *See also Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998); *Irvin v. Kaczmaryn*, 913 F.Supp. 1190, 1199-1200 (N.D. Ill. 1996).

E. Conclusion

For the reasons explained above, the Court finds that no reasonable jury could find, based on the evidence presented at trial, that the defendants violated Mr. Davis constitutional

rights.  The Court further finds that, even if the evidence could support Mr. Davis' claims, the defendants are entitled to qualified immunity for any constitutional violation that occurred during the February 9, 2001 encounter.  Accordingly, the Court grants the defendants' motion for judgment as a matter of law. The Clerk is directed to enter judgment in favor of the defendants.

Dated: June 15, 2004

ENTER:

ARLANDER KEYS
United States Magistrate Judge