# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 572 | **DATE** | 11/1/2004 |
| **CASE TITLE** | Michael E. Davis vs. Charles Novy et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. Plaintiff's Motion for a New Trial or to Alter or Amend Judgment [#81] is denied as set forth in the Order attached. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

3
number of notices

NOV 0 2 2004
date docketed

GmA
docketing deputy initials

11/1/2004
date mailed notice

**Document Number**

88

FT/*pley* courtroom deputy's initials

CLERK, U.S. DISTRICT COURT

2004 NOV -1 PM 2: 02

Date/time received in central Clerk's Office

FT
mailing deputy initials

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

**NOV 0 2 2004**

MICHAEL E. DAVIS,                    )
                                     )
            Plaintiff,               )    No. 03 C 572
                                     )
      v.                             )
                                     )    Magistrate Judge
CHARLES NOVY and LUIS ESCOBAR,       )    Arlander Keys
individually and in their capacity   )
as Bolingbrook police officers,      )
                                     )
            Defendants.              )


### MEMORANDUM OPINION AND ORDER

Michael Davis sued Charles Novy and Luis Escobar, both

police officers with the Village of Bolingbrook, alleging that

they violated his Fourth Amendment rights during the course of a

traffic stop and the subsequent search of his truck and his home.

The case went to trial on May 17, 2004, and, at the close of

Plaintiff's case, the Court granted Defendants' Motion for

Judgment as a Matter of Law. Currently before the Court is Mr.

Davis' Motion for a New Trial, or in the Alternative, to Alter or

Amend Judgment. For the reasons set forth below, the Court

denies Mr. Davis' Motion.

A.    Factual Background

The Court fully set forth the relevant factual background,

including the evidence and testimony introduced at trial, in its

Memorandum Opinion and Order granting Defendant's Motion for

Judgment as a Matter of Law. *Davis v. Novy*, No. 03 C 572, 2004



WL 1368798 (N.D. Ill. June 16, 2004). The Court will repeat the facts here.

On February 9, 2002, Michael Davis was driving around his Bolingbrook neighborhood taking pictures of snow mounds. Mr. Davis, who uses a wheelchair to get around, was attempting to document a problem with the way the village plowed snow; according to Mr. Davis, the plows piled the snow in a way that blocked his access to streets and sidewalks and prevented him from taking his dogs out for exercise. Mr. Davis left his house at about 11:30 a.m., driving around the neighborhood in his 1995 dark green Ford F150 pickup truck with a black camper shell on the back of it.

At about noon that same day, the Bolingbrook police department received a call through its 9-1-1 dispatcher, complaining that a white male was driving around the area of Commonwealth and Brighton in Bolingbrook, taking pictures of a young girl. The caller reported that the man was wearing a hat and driving a black Ford pickup truck with a cab on the back. The dispatcher assigned two officers to respond to the call, Officer Charles Novy and Officer Luis Escobar.

Upon arriving at the general area reported in the call, Officer Novy saw Mr. Davis, a white male, and his dark green Ford pickup truck with a cab on the back of it. Officer Novy followed Mr. Davis for a bit, and then pulled him over. Upon doing so,

Officer Novy noticed a hat and a camera bag on the seat next to Mr. Davis; he also saw towels, duct tape and rope in the cab. When Mr. Davis could not provide a valid Illinois driver's license or proof of insurance, Officer Novy arrested him, placing him in the backseat of his squad car.

Officer Escobar joined the two at some point during this initial encounter. The officers searched Mr. Davis' truck, after obtaining Mr. Davis' permission to do so, and found a pair of women's thong underpants and a stub from the Brookfield Children's Zoo. They then asked him to sign a card stating: "I give the Bolingbrook police department permission to search the following: [here, Officer Escobar had filled in "residence"] located at the following: [here, Officer Escobar had filled in 1095 Bothwell," Mr. Davis' address]. I give this permission voluntarily & without threats or promises of any kind." *See* Plaintiff's Exhibit 8. Mr. Davis signed the card, and the officers searched his home. That search turned up nothing to suggest that Mr. Davis was involved in any way with child pornography or other child exploitation.

After the search, the officers and Mr. Davis went back outside, where Officer Novy issued citations to Mr. Davis for driving without a valid Illinois' driver's license, for driving an uninsured vehicle, and for having an obstructed registration sticker on his rear license plate – all violations of the

3

Illinois vehicle code. Officer Novy allowed Mr. Davis to give a signature in lieu of posting a bond, and then he left; Officer Escobar left while Novy was writing up the citations.

Almost a year later, on January 24, 2003, Mr. Davis sued Officer Novy and Officer Escobar, alleging that they violated his constitutional rights in the course of the initial stop, and in the subsequent searches of his person, his truck and his home.

B.    The Trial

The case was tried before a jury on May 17, 18 and 19, 2004. At trial, Mr. Davis testified first. He explained that, on February 9, 2002, he decided to drive through the neighborhood to take pictures of snow mounds so that he could show the Village how the snow impeded his access to the streets and sidewalks, and to try to find a way to solve the problem. Tr. at 106. He described the route he drove, which, according to the map shown to the jury, put him in or near the area reported in the 9-1-1 call. Tr. at 111-12.

Mr. Davis testified that, at some point while he was out on his picture-taking expedition, he noticed a police car following him, and he was eventually pulled over. Tr. at 110, 112-13. He testified that, when Officer Novy approached the truck, he asked the officer whether he had done anything wrong, and Officer Novy had responded "no." Tr. at 113. According to Mr. Davis, Officer Novy said he stopped him because the police department had

4

"received an anonymous 911 phone call from some woman stating that I had been taking pictures of children." Tr. at 114. Mr. Davis testified that Officer Novy then asked him for his driver's license and insurance card; he produced his Indiana driver's license, which he learned was no longer valid, but he was unable to provide an insurance card. Tr. at 115, 117.

Mr. Davis testified that Officer Escobar arrived on the scene about this time, and, after the two officers conferred briefly, Officer Novy asked Mr. Davis if he could search his truck. Tr. at 117-18. Mr. Davis testified that he asked what would happen if he refused, and Officer Novy told him that they would have to impound his truck and take him to jail. Tr. at 118. Mr. Davis testified that he then agreed to the search; Officer Novy searched his truck for about 30 to 45 minutes, while Mr. Davis sat on the tailgate of his truck, with Officer Escobar standing in front of him in a defensive posture. Tr. at 119-20, 122.

Mr. Davis testified that, after Officer Novy searched the truck, he told Mr. Davis he was under arrest; Officer Novy patted him down and asked him to empty his pockets, which he did. Tr. at 123. Mr. Davis testified that Officer Novy then placed him in the backseat of the squad car and told him that he wanted to search his house, which was just a few blocks away. Tr. at 13-24. Mr. Davis testified that he again asked what would happen if

5

he refused, and Officer Novy again told him that he would impound his truck and take him to jail. Tr. at 124. Mr. Davis testified that the officers presented him with a consent card, and he signed it. Tr. at 124, 127. The three then proceeded to his house, where Officer Novy searched through his bedroom (in the closets, dresser drawers, and boxes) and took a cursory look through his garage, then they went back outside. Tr. at 131-33. Mr. Davis testified that Officer Novy then wrote out the tickets and filled out some other paperwork, gave copies to him, and then left. Tr. at 133-34.

Mr. Davis conceded that he had committed the violations for which he ultimately received citations: he testified that he had moved to Illinois in August of 2001, and that he had never obtained an Illinois driver's license; he admitted that, on the morning of February 9, 2002, the registration sticker on the rear license plate of his truck was partially obscured by the bracket around the plate; and he admitted that, as of that date, he had no insurance for his truck. Tr. at 103, 146-48, 150-51. Mr. Davis testified that, when Office Novy approached his truck, there was, in fact, a hat, a camera, a camera bag, towels, duct tape and rope in the cab of his truck, all either on the seat next to him or on the floor of the cab. Tr. at 153-54.

With respect to the officers' demeanor, Mr. Davis testified that, during the initial traffic stop, Officer Novy was polite to

him; he was neither rude nor abrasive, threatening nor offensive. Tr. at 152. So too during the course of the search of his truck. Tr. at 161. He testified that the officers did not touch him or handcuff him; they did not display their weapons. Tr. at 156-57, 162. Mr. Davis testified that he had agreed to the searches of his truck and home, but that he did so because he felt coerced by Officer Novy's initial comment to him that the police had received a call about someone taking pictures of children. Tr. at 178-80. He later testified that he also felt coerced because of Officer Novy's statement that, if Mr. Davis did not allow the officers to search his truck and his home, they would arrest him, take him to jail, and impound his truck. Tr. at 181. Mr. Davis testified that he also felt coerced when Officer Novy put him in the backseat of his police car and closed the door. *Id.* at 182.

Next, Plaintiff called Officer Novy to the stand. He testified that he was on duty at around noon on February 9, 2002 when he received a call on his MDT in his squad car indicating that the department had received a complaint, via cell phone, about a man in a truck taking pictures of kids. Tr. at 185. According to the report, the suspect was a white male wearing a hat and driving a black Ford pickup with a cab on the back; he was reportedly driving near the intersection of Commonwealth and Brighton in Bolingbrook. Tr. at 185, 188. Officer Novy testified that he responded to that general area, where he saw

7

Mr. Davis' truck, which, in his view, closely matched the truck described in the report. *Id.* at 188-89.

Officer Novy testified that he pulled in behind Mr. Davis and followed him for a time. Tr. at 245-46. He further testified that he then noticed that the registration sticker on the rear license plate of Mr. Davis' truck was obstructed or covered such that the month of expiration was unreadable, and that he knew that was a violation of the Illinois vehicle code. *Id.* at 246. Officer Novy testified that, after following Mr. Davis for a while, and after learning from Officer Escobar that he had no additional information on the report, Officer Novy radioed in a traffic stop, engaged his emergency lights and pulled Mr. Davis over. Tr. at 190-95, 247. Officer Novy testified that, when he made the decision to stop Mr. Davis, he had two things in his mind: first, he was thinking that this vehicle matched the description of the vehicle reported over the MDT, and, second, he was thinking that the same vehicle was showing a clear violation of the Illinois vehicle code. Tr. at 246-47.

Officer Novy testified that, after Mr. Davis pulled over, he walked up to the truck and asked Mr. Davis for his driver's license; as he did so, he looked into the cab and saw a camera bag and black hat on the seat next to Mr. Davis, rope and duct tape on the floor of the cab, and towels covering the seat, the

8

floor and the dashboard of the truck.  Tr. at 247-48.  He
testified that those things, even if seemingly innocuous on their
own, together raised some red flags in his mind, given his
experience and training.  Tr. at 247-50.  Additionally, when
Officer Novy asked Mr. Davis for his driver's license, Mr. Davis
produced an Indiana license; and when Officer Novy asked Mr.
Davis for proof of insurance, he was unable to provide it; those
things were significant to Officer Novy because they both amount
to violations of the Illinois vehicle code.  Tr. at 251-53.

Officer Novy testified that, after the conversations about
Mr. Davis' driver's license and inability to provide an insurance
card, he told Mr. Davis that he pulled him over because the frame
on his rear license plate covered the sticker, which is a
violation of the Illinois vehicle code.  Tr. at 253.  Officer
Novy testified that he then asked Mr. Davis if he had been taking
pictures, and explained that the police department had received a
call about someone taking pictures of children.  Tr. at 253-54.
According to Officer Novy, Mr. Davis explained that he had been
taking pictures of snow mounds and why; he also offered to turn
over a roll of film to corroborate his story.  Tr. at 254.
Officer Novy testified that he was polite at all times to Mr.
Davis, and that Mr. Davis was cooperative at all times with the
officers.  Tr. at 256-57, 259-60, 267.

Officer Novy testified that he asked Mr. Davis for

permission to search the cab of his truck, Mr. Davis agreed to the request, and walked to the tailgate of his truck, where he waited with Officer Escobar while Officer Novy searched the truck. Tr. at 259-61. Officer Novy testified that, in the course of that search, which took about twenty minutes, he found a pair of black thong underwear and a ticket stub to the Brookfield Children's Zoo. Tr. at 262-63. Officer Novy testified that, after discussing the situation with Officer Escobar, he advised Mr. Davis that he was under arrest for not having a valid Illinois driver's license, for having no insurance and for having an improper display of his registration plate. Tr. at 271. Officer Novy testified that he then patted Mr. Davis down, had him empty his pockets, and placed him in the back of his squad car; he did not handcuff Mr. Davis at this time, or ever. Tr. at 272-74.

Officer Novy testified that he and Officer Escobar then decided to ask Mr. Davis for permission to search his home; they had him sign a "voluntary permission to search" card, Tr. at 276-77, and then drove, with Mr. Davis in the backseat, to Mr. Davis' house. Tr. at 280-82. Officer Novy testified that he searched Mr. Davis' house and garage for a total of about twenty-five minutes, and found nothing unusual; they then went outside, Officer Novy issued the three citations to Mr. Davis (one for driving without a valid Illinois driver's license, one for

10

driving an uninsured vehicle, and one for improperly displaying
his registration sticker), and completed some additional
paperwork, he apologized to Mr. Davis for taking up so much of
his time, and then the officers left. Tr. at 290-303. By
Officer Novy's estimate, the entire encounter – from the time
Officer Novy pulled Mr. Davis over, to the time he released him
from his custody – lasted less than two and a half hours. Tr. at
319.

With regard to the 9-1-1 call at issue, Officer Novy
testified that he had had specialized training in dealing with
crimes against children and with pedophiles, and that he was
aware of another call that had come in approximately eleven days
before Mr. Davis' arrest; that call reported a white male taking
pictures of a child in the same area as the February 9th call.
Tr. at 241-44.

After Officer Novy, Mr. Davis called his treating
psychiatrist, Dr. Gerson Kaplan, to the stand. Dr. Kaplan
testified that he had been treating Mr. Davis since August of
2002, after Mr. Davis was referred to him by a colleague, Dr.
Daniel Shapiro. Tr. at 332. Dr. Kaplan testified that Mr. Davis
had come to see him because he was upset after the run-in with
Officers Novy and Escobar; Dr. Kaplan diagnosed Mr. Davis with
post-traumatic stress disorder ("PTSD"), and prescribed
antidepressants and various medications to help him sleep. Tr.

at 333-35. Dr. Kaplan testified that, in his view, Mr. Davis continues to suffer from PTSD as a result of the events of February 9, 2002. *Id.* at 337-38. On cross examination, counsel for the defendants raised a number of inconsistencies between what Mr. Davis had reported to Dr. Kaplan, and what he had reported to the psychiatrists he had seen in the past, and these seemed to surprise Dr. Kaplan. Ultimately, Dr. Kaplan conceded that Mr. Davis' behavior was as consistent with paranoid disorder as it was with PTSD, and that, to the extent Mr. Davis suffered from PTSD, it was not necessarily triggered by the February 9, 2002 encounter with Officers Novy and Escobar; in fact, Dr. Kaplan conceded, Mr. Davis had experienced a number of events before that day that could have been perceived as traumatic and could have triggered the PTSD. Tr. at 351-67.

After Dr. Kaplan, Plaintiff called Pamela Carter, who works in telecommunications with the Bolingbrook police department; Ms. Carter testified about how the calls coming in to the dispatch center are logged and how various codes on the call sheets are interpreted. Tr. at 405-22.

Finally, Mr. Davis called Officer Escobar to the stand. Officer Escobar testified that he received the 9-1-1 call on his MDT and responded to the scene. Officer Escobar testified that he briefly investigated the matter, but he obtained no additional information on the incident, and he reported this fact to Officer

Novy, who had also been assigned to the call.  Tr. at 436-41.
Officer Escobar testified that he then learned that Officer Novy
had initiated a traffic stop in connection with the call, and so
Officer Escobar began heading in the direction of that stop; when
he arrived on the scene, he saw a truck that matched the
description given in the 9-1-1 call, and he saw Officer Novy
sitting in his squad car right behind the truck.  Tr. at 442.  At
that time, Officer Escobar testified, he walked up to Officer
Novy's squad car, and Officer Novy told him that he had stopped
Mr. Davis for having an obstructed registration sticker.  Tr. at
442-43.

Officer Escobar testified that, Officer Novy told him what
he had seen in Mr. Davis' truck and said that he wanted to search
the cab; Officer Escobar agreed that, based on what Officer Novy
had seen in plain view, a search of the cab was appropriate.
Officer Escobar testified that Officer Novy then searched Mr.
Davis' truck, while Mr. Davis sat on the tailgate of the truck,
and Officer Escobar stood 7 to 10 feet in front of him in an
"interview stance" - that is, he stood facing Mr. Davis with his
hands out in front of him.  Tr. at 443-44.  According to Officer
Escobar, the search of the truck took about 20 or 30 minutes.
Tr. at 444.

Officer Escobar testified that he did not make the decision
to arrest Mr. Davis; that decision was made by Officer Novy.  Tr.

at 448. Escobar further testified that he heard Officer Novy radio to dispatch that he was arresting Mr. Davis for driving without a valid Illinois driver's license. *Id.* Officer Escobar testified that, throughout the encounter, Mr. Davis was very cooperative, and that he either suggested that the officers search his truck, or Officer Novy asked him if they could search his truck and he said yes. Tr. at 459, 463. In Officer Escobar's view, Officer Novy behaved in a very professional manner in his dealings with Mr. Davis, and Mr. Davis, in turn, was very cooperative with the officers; Officer Novy was never verbally abusive or threatening; he never touched Mr. Davis, never touched his weapon or otherwise gestured in a manner that could be perceived as threatening. Tr. at 464-65.

Officer Escobar testified that, after Officer Novy searched the truck, he told him what he had found, and told him that he wanted to ask Mr. Davis if they could search his house; Officer Escobar agreed that the items in Mr. Davis' truck - the thong and the zoo stub - were cause for concern. Tr. at 466, 468. Officer Escobar testified that he got a consent to search card from his car, filled it out and presented it to Mr. Davis; he testified that he read the card verbatim to Mr. Davis, and that Officer Novy also explained the card, in his own words, to Davis. Tr. at 468-70. Shortly thereafter, Mr. Davis signed the card; according to Officer Escobar, Mr. Davis at no point gave any indication -

14

physical or verbal - that he was unwilling or hesitant to allow the search; on the contrary he remained cooperative throughout. Tr. at 471.

With respect to the search of the house, Officer Escobar testified that he did not really participate; instead, his role was to help assure Officer Novy's safety during the search. Tr. at 473-75. Officer Escobar testified that the three went back outside before 2:00 p.m. He helped to start the paperwork and then he left, making a brief stop to report to the supervising sergeant (who was parked just down the street), before heading back to the station. Tr. at 476-77.

### The Motion for Judgment as a Matter of Law

At the close of Mr. Davis' case, which, because of the way the witnesses were called and examined, actually include a large part of the officers' case, Defendants moved for judgment as a matter of law. The Court indicated that the motion would be granted, and briefly explained why. Shortly thereafter, the Court issued an extremely detailed Memorandum Opinion and Order discussing the evidence presented at trial, the legal standards at issue, Plaintiff's burden, and the Court's conclusion that no reasonable jury could find, based on the evidence presented at trial, that Defendants had violated Mr. Davis constitutional rights. *Davis v. Novy*, No. 03 C 572, 2004 WL 1368798 (N.D. Ill. June 16, 2004). The Court further found that, even if Mr. Davis'

15

evidence sufficiently supported his claims, Defendants were entitled to qualified immunity for any constitutional violation that occurred during the February 9, 2001 encounter.

## DISCUSSION

Mr. Davis contends that the Court's decision to grant the Officers' Motion for Judgment as a Matter of Law was erroneous, because: 1) there was sufficient evidence from which a jury could infer that Officer Novy's decision to stop Mr. Davis was unconstitutional; 2) the jury should have been allowed to determine whether Plaintiff's consents to search his car and home were coerced; and 3) Defendants were not entitled to qualified immunity. After reviewing Mr. Davis' arguments, the Court finds no reason to deviate from its conclusions in *Davis v. Novy,* No. 03 C 572, 2004 WL 1368798 (N.D. Ill. June 16, 2004).

Officer Novy's Stop was Constitutional

To establish a constitutional violation with respect to the initial traffic stop, Mr. Davis had to produce evidence showing that Officer Novy lacked reasonable suspicion to believe that Mr. Davis was, or was about to be, engaged in criminal activity. "Reasonable suspicion" "requires more than a mere 'hunch'"; it is some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Ienco*, 182 F.3d 517, 523, 524 (7th Cir. 1999) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

16

The parties concede that Mr. Davis' obscured registration was the only constitutionally permissible basis for the traffic stop at issue. At trial, Officer Novy candidly admitted that he initially began following Mr. Davis' vehicle because it matched the description in the 9-1-1 call. Officer Novy further testified that, while following Mr. Davis, he noticed that his registration sticker was obscured. Thus, Mr. Davis' argument hinges upon whether he has any evidence from which a jury could reasonably infer that Officer Novy did <u>not</u> notice the obscured registration prior to pulling over Mr. Davis' vehicle.

Mr. Davis argues that the following evidence was sufficient to present the issue to the jury: 1) Officer Novy told Mr. Davis, at the time of the stop, that he had not committed a traffic offense; 2) although Officer Novy testified that he noticed the infraction on Boughton Road, he did not pull over Mr. Davis for several blocks; 3) at the time of the stop, Officer Novy communicated to Officer Escobar, via radio, that he had pulled over the 9-1-1 suspect; 4) Officer Novy informed dispatch that he was arresting Plaintiff for "no valid", but did not mention the obstructed sticker; 5) Officer Escobar's incident report omits mention of the obstructed sticker; and 6) Officer Novy and Officer Escobar were otherwise incredible.

The Court disagrees that this evidence gives rise to the inference that Officer Novy did not notice the obstructed sticker

17

prior to pulling over Mr. Davis. It is undisputed that the sticker was obscured, and that Officer Novy issued Mr. Davis a citation for, among other infractions, the obscured sticker. As explained in the Court's Opinion granting Defendants' Motion for Judgment as a Matter of Law, it is irrelevant that Officer Novy may have had mixed motives in deciding to stop Mr. Davis. *See, e.g., Whren v. United States*, 517 U.S. 806, 812-13 (1996)(an otherwise valid traffic-violation arrest is not rendered invalid by the fact that it was "a mere pretext for" some other type of search.) This conclusion is not altered by the fact that Officer Novy "radioed in" and ticketed Mr. Davis for an expired license. *United States v. Bookhardt,* 277 F.3d 558, 565 (D.C. Cir. 2002) (upholding arrest on different grounds than that cited by the officer); *United States v. Dhinsa*, 171 F.3d 721, 725 (2nd Cir. 1998) (upholding traffic stop on the basis of an observed violation, notwithstanding the officer's reliance upon a different ground). Finally, the Court disagrees that either the Officers' testimony or the Officers' conduct, as highlighted by Mr. Davis, gives rise to the inference that they were incredible.

The Court finds that Mr. Davis failed to produce sufficient evidence from which a jury could infer that the registration infraction was merely a post-hoc justification for an otherwise unconstitutional stop. Therefore, the Court rejects Mr. Davis' attack on the constitutionality of the stop.

## The Search of Mr. Davis's Truck Was Constitutional

Next, Mr. Davis claims that the Officers' searches of his truck and his home were unconstitutional. Initially, the Court notes that, once Officer Novy discovered that Mr. Davis did not possess proof of insurance or a valid driver's license, Officer Novy was authorized to arrest Mr. Davis, *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), and to conduct a search of his vehicle incident to that arrest. *United States v. Robinson*, 414 U.S. 218 (1973). Even if the Court had concluded that there was sufficient evidence to suggest that Mr. Davis' permission to search his vehicle may not have been consensual[1], Officer Novy's search of Mr. Davis's vehicle was constitutional even absent Mr. Davis' consent. Therefore, the Court rejects Mr. Davis' claim that the search of his vehicle was unconstitutional.

## Mr. Davis Voluntarily Consented to the Search of His Home

With regard to the Officers' search of Mr. Davis' home, the Court finds that the searches were conducted pursuant to a valid consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Mr. Davis admitted that he signed a consent card for the search of his home; that the officers were polite and professional; and that the officers were never threatening or offensive.

---

[1] The Court's June 16th Opinion fully articulates the Court's conclusion that the search was consensual and constitutional. *Davis v. Novy*, No. 03 C 572, 2004 WL 1368798 (June 16, 2004)

Nevertheless, Mr. Davis argues that the issue should have gone to the jury because Officer Novy placed him in the squad car and told him he would be taken to jail if he did not consent, and because Mr. Davis is disabled. The Court again disagrees that these two factors, when considered with Mr. Davis' admission regarding the circumstances surrounding the consent and the search (including the Officers' demeanor and his apparent cooperation), and Mr. Davis' age and education, are simply insufficient to establish that the consent was involuntary. *United States v. McCarthur*, 6 F.3d 1270, 1277 (7th Cir. 1993) ("although the encounter had ripened into an investigatory stop when [the officer] advised [the defendant] that they planned to detain her bag for a canine sniff, that fact alone did not vitiate her consent to a search of the bag.")

## Qualified Immunity

Finally, the Court concludes that, even if Mr. Davis had established that the stop and the searches of his car and home were unconstitutional, the Officers were entitled to qualified immunity[2].

---

[2] For purposes of this inquiry, the Court's conclusion that Officer Novy is shielded from liability necessarily extends qualified immunity to Officer Escobar, as there is no suggestion that Officer Escobar's reliance upon Officer Novy's representations was unreasonable. *United States v. Hensley*, 469 U.S. 221, 232 (1986)

"[G]overnment officials performing discretionary functions"
are shielded from liability "as long as their actions could
reasonably have been thought consistent with the rights they are
alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635,
638 (1987) (citations omitted). "[W]hether an official protected
by qualified immunity may be held personally liable for an
allegedly unlawful official action generally turns on the
'objective legal reasonableness' of the action . . . assessed in
light of the legal rules that were 'clearly established' at the
time it was taken . . . ." *Id.* at 639. The doctrine of
qualified immunity allows for the realization that "[i]t is
sometimes difficult for an officer to determine how [a
particular] legal doctrine . . . will apply to the factual
situation the officer confronts." *Saucier v. Katz*, 533 U.S. 194,
205 (2001). "If the officer's mistake as to what the law
requires is reasonable, . . . the officer is entitled to the
immunity defense." *Id.* Thus, "[o]fficers under this standard
may be protected from liability for objectively reasonable
decisions, even if wrong"; "qualified immunity is not forfeited
unless 'no reasonable officer could have mistakenly believed'
that the conduct was lawful." *Saffell v. Crews*, 183 F.3d 655,
658 (7th Cir. 1999) (citing *Jones v. City of Chicago*, 856 F.2d
985, 994 (7th Cir. 1988)).

The Court readily concludes that Officers Novy and Escobar were reasonable in their belief that the initial stop and subsequent searches of Mr. Davis' automobile and home were lawful.

With regard to the initial stop, the evidence in this case permitted but one conclusion; Officer Novy stopped Mr. Davis' vehicle after noticing his obscured registration sticker. Illinois law permitted Officer Novy to stop Mr. Davis for such an infraction, 625 ILCS 5/3-413(b) ("Registration stickers . . . shall be . . . clearly visible at all time."); ergo, Officer Novy was reasonable to believe his conduct was permissible. Even if Officer Novy pulled over Mr. Davis solely because of the 9-1-1 call, the Court concludes that Officer Novy would, nevertheless, have been entitled to immunity. *See Davis*, 2004 WL 1368798 at **27-29.

Similarly, Officer Novy's search of Mr. Davis' vehicle was reasonable. Caselaw is clear that, under circumstances similar to those presented in the instant case, qualified immunity shields officers conducting searches pursuant to a verbal consent. *See Hudson v. Hall,* 231 F.3d 1289, 1292 (11th Cir. 2000). Officer Novy's search of Mr. Davis' vehicle was not only pursuant to Mr. Davis' consent, but was incident to a lawful arrest. Thus, if Mr. Davis had been able to establish that his consent was involuntary, Officer Novy was still authorized to

search the vehicle incident to Mr. Davis' lawful arrest.

Finally, Mr. Davis consented to allow Officer Novy and Officer Escobar's to search his home. Although Mr. Davis makes much of the fact that he was extremely nervous and allegedly felt compelled to permit the search, he concedes that he indicated a desire to cooperate with the officers and never expressed a desire to prevent the search. Under these circumstances, the Court finds that the Officers reasonably believed that Mr. Davis' consent was voluntary. Therefore, qualified immunity shields the Officers from any liability resulting from the stop or searches.

## Conclusion

For the reasons explained above, the Court finds that no reasonable jury could find, based on the evidence presented at trial, that the defendants violated Mr. Davis' constitutional rights. The Court further finds that, even if the evidence could support Mr. Davis' claims, Defendants are entitled to qualified immunity for any constitutional violation that occurred during the February 9, 2001 encounter. Accordingly, the Court denies Plaintiff's Motion for a New Trial, or to Alter or Amend Judgment.

Dated: November 1, 2004          E N T E R:

ARLANDER KEYS
United States Magistrate Judge